UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
GLORIA ALLEN,                                  21-cv-6420

                        *Plaintiff*,                    **COMPLAINT**

          -against-

LESLEY STIER, SHIRLEY STIER, and
NASSAU CANDY DISTRIBUTORS, INC.,

                        *Defendants*.
--------------------------------------------------------X

          Plaintiff Gloria Allen, for her Complaint against Defendants Lesley Stier,

Shirley Stier, and Nassau Candy Distributors, Inc. (collectively, "Defendants"),

alleges as follows through her undersigned counsel:

                        <u>**Introduction**</u>

          1.     Plaintiff Gloria Allen is an older African-American woman who

worked as a live-in domestic servant of the Stier family for 37 years, caring for

four generations of the Stier family with unsurpassed loyalty and dedication.

          2.     Throughout her 37 years of employment, Allen served and cared for

Lesley and Shirley Stier, raised their four sons and helped serve them and their

families into adulthood, helped care for the Stiers' grandchildren, cared for Shirley

Stier's aged father before he passed, applied her skills as a trained nurse to help

protect and heal members of the Stier family facing illness or disease or recovering from surgeries, and served as one of the Stiers' live-in housekeepers.

3.    The Stiers, who have been blessed with tremendous wealth, repaid Allen's loyalty and dedication by:

- paying her an illegally-low wage that was about half as much per day as what the Stiers paid their non-black servants;

- lying to her about the severance she would receive if she remained with them until she retired;

- barring her and their other black housekeeper from ever visiting their homes during the Covid-19 pandemic while allowing their non-black housekeeper to do so freely; and

- stereotyping her as a slavishly obedient older black woman who was born to serve, who was too "invisible" to matter, and who lacked the intelligence to notice how little she was being paid compared to the Stiers' non-black housekeepers.

4.    As detailed herein, Defendants are liable to Allen under 42 U.S.C. § 1981 and state law for their race-based pay discrimination and disparate treatment, and under the Fair Labor Standards Act and state law for their wage and hour violations.

2

**Jurisdiction & Venue**

5.     This Court has subject matter jurisdiction over Allen's federal claims pursuant to 42 U.S.C. § 1981, 29 U.S.C. § 201, *et seq.*, and 28 U.S.C. § 1331.

6.     This Court also has supplemental jurisdiction over Allen's state-law claims because they derive from a common nucleus of operative fact and form part of the same case or controversy as Allen's federal claims. See 28 U.S.C. § 1367

7.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) based on Defendants' residence and the principal location where Allen worked.

**The Parties**

8.     Plaintiff Gloria Allen is a resident of the State of New York, Bronx County, residing at 3935 Monticello Ave., Bronx, NY 10466.

9.     Defendant Lesley Stier is an individual residing at 9 Horseshoe Road, Old Westbury, NY 11568.

10.     Defendant Shirley Stier is an individual residing at 9 Horseshoe Road, Old Westbury, NY 11568 and 41 Barclay Drive in the Hamptons.

11.     Defendant Nassau Candy Distributors, Inc. ("Nassau Candy") is a domestic corporation headquartered at 530 West John Street, Hicksville, NY 11801, with satellite "home offices" of its CEO (Lesley Stier) at 9 Horseshoe Road, Old Westbury, NY 11568 and 41 Barclay Drive in the Hamptons.

12.     Upon information and belief, Nassau Candy is a Long Island-based manufacturer, importer and distributor of specialty confections, gourmet foods & perishables, with several hundred employees and distribution centers in New York, Florida, Texas, Michigan, and California.

13.     Besides her regular housekeeping duties, Allen regularly cleaned the satellite home offices of Nassau Candy's CEO (Lesley Stier) at the Stiers' homes in Old Westbury and the Hamptons.

14.     Allen's annual holiday bonus was paid by Nassau Candy.

15.     Through its CEO Lesley Stier, Nassau Candy, together with Lesley Stier individually and his wife Shirley Stier, jointly controlled and determined the existence, terms, conditions, and compensation of Allen's employment, and the timing of said compensation payments, and maintained employment records in connection therewith, such that all three Defendants were joint employers of Allen at all times herein.

4

## First Cause of Action

## Race-Based Pay Discrimination and Disparate Treatment
## in Violation of 42 U.S.C. § 1981

16.     The Complaint's other factual allegations are incorporated herein by reference.

17.     Allen, who is African-American/black and 77 years old, was employed as one of Defendants' domestic servants for approximately 37 years, from 1983 (with a temporary break in service in the early 1990s) until April 4, 2021.

18.     At all material times herein, Allen's principal duty consisted of housekeeping and other domestic services in and about Defendants' properties in Old Westbury and the Hamptons.

19.     Despite Allen's loyal and dedicated service to the Stiers, Shirley Stier referred to Allen behind her back as a "moron" and an "imbecile" without there having been any misstep, infraction, or error in judgment on Allen's part that might have explained such name-calling, and Defendants stereotyped her as a slavishly obedient older black woman who was born to serve, who was too "invisible" to matter, and who lacked the intelligence to notice how little she was being paid compared to the Stiers' non-black housekeepers.

20.     Although Allen and Defendants' non-black/African-American housekeepers were all underpaid as well because they never received overtime or spread-of-hours pay and were all paid on a weekly basis without regard to the number of regular and overtime hours they worked, Defendants at all material times paid Allen a much lower wage (equal to $57-$67 per day) than their non-black/African-American housekeepers during Allen's employment, including Beata "Betty" Pietrasik, "Lynette," "Victoria," "Miriam," and other housekeepers.

21.     Defendants at all material times required Allen to work a longer work-week (generally at least six days a week, and seven days a week during the Covid-19 pandemic) than Defendants' non-black/African-American housekeepers (who generally worked five days a week, or less in the case of "Victoria," who only worked four days a week).

22.     On a per-day basis, the above disparity translates to $57-$67 a day for Allen compared to $100-$150 a day for Defendants' non-black/African-American housekeepers.

23.     Allen was paid less than the federal and state minimum wage at all material times herein.

24.     Upon information and belief, none of Defendants' non-black/African-American housekeepers were paid below the federal minimum

wage.

25.     In addition, the Stiers required Allen to shoulder their legally-mandated employer's-side payroll tax equal to 7.65 cents of every dollar earned (FICA/FUTA, etc.), while, upon information and belief, covering those costs for their non-black/African-American servants. See *Gonzalez v. Trinity Marine Group, Inc.*, 1994 WL 623985, at *1 (E.D. La. 1994) (denying dismissal of claim that defendant's "allegedly unlawful decision to classify [plaintiff] as an independent contractor resulted in continuous salary discrimination on the basis of his race, color and/or national origin.").

26.     Unlike Defendants' non-black/African-American housekeepers, Allen also had to periodically babysit about once a week on average at the home of one of the Stiers' son's families in the evenings for no extra pay.

27.     Allen and Defendants' non-black/African-American housekeepers performed equal work in connection with a job (housekeeper) which, apart from Allen's longer workweek and certain additional duties that she performed, required equal skill, effort and responsibility and was performed under similar working conditions.

28.     Consistent with their stereotyping Allen as a "moron" and an "imbecile" who was too "invisible" to matter, Defendants made false

compensation-related promises to Allen that they apparently saw no need to keep track of, much less honor, including promising each year that she would receive an extra week's pay or an extra week off for the even more demanding and time-consuming work she performed for Defendants each summer in the Hamptons, and promising that she would receive $20,000 as severance pay if she continued working for Defendants until she retired.

29.     By contrast, Defendants did not (upon information and belief) make compensation-related promises to their non-black/African-American housekeepers that they did not keep or intend to keep.

30.     Defendants also required Allen to cover her own travel costs to and from Defendants' homes in Old Westbury and the Hamptons at the beginning and end of her workweek (consuming about 30% of her subminimum wage) while paying for the transportation costs of the non-black/African-American housekeeper at that time (Miriam). See *Tolbert v. Smith*, 790 F.3d 427, 436 (2d Cir. 2015) ("A benefit that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion[.]").

31.     During the Covid-19 pandemic Defendants also selectively forbade Allen and the other black/African-American housekeeper (Andrea Williams) from going home on their days off, while allowing the non-

black/African-American housekeeper employed at that time (Miriam) to do so freely.

32.     Andrea Williams quit when faced with the Stiers' ultimatum, much to the Stiers' consternation.

33.     Allen could not afford to quit, and therefore ended up spending more than one year straight with the Stiers without having a day off or being able to visit her home.

34.     Defendants' above-referenced conduct amounts to discrimination on the basis of race and color. "An inference of discrimination can arise from … the more favorable treatment of employees not in the protected group." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 312 (2d Cir. 2015).

35.     Moreover, "satisfaction of the Equal Pay Act's unequal-pay-for-equal-work standard is sufficient (although not necessary) to establish an adverse employment action." *Torre v. Charter Communs., Inc.*, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) .

36.     Upon information and belief, Defendants' actions were influenced to some extent by their thoughts about race, and their thoughts about race were, upon information and belief, influenced by racial stereotypes which

caused them to view Allen as someone born to serve and to take offense at blacks who asserted themselves. By way of example, and not by way of limitation:

(A)     They expressed disapproval at the refusal of the other black/African-American housekeeper Andrea Williams (who Shirley Stier also often referred to behind her back as "moron" and "imbecile" without there having been any misstep, infraction, or error in judgment on Williams' part that might have explained such name-calling) to accept their ultimatum that she and Allen not be allowed to return home on their day/s off while the non-black/African-American housekeeper was allowed to go home freely on her days off;

(B)     Shirley Stier lamented that no one allegedly knows where Barack Obama came from, that a black President wouldn't fit in, and that she would not vote for him if he were the last person running on Earth;

(C)     Lesley and Shirley Stier lamented that a Nassau Candy employee who was fired complained that he had been discriminated against due to his race (believed to be African-American); and

(D)     As Allen's retirement day was nearing, one of the Stiers' non-black/African-American housekeepers (Miriam) told Allen in words or substance that Shirley Stier told her that she was hiring someone like Miriam (Hispanic) to replace Allen rather than another black person.

37.     The above-referenced pay discrimination and disparate treatment deprived Allen of an equal right to the making, performance and modification of her at will employment contract and to the benefits, privileges, terms, and conditions of said contractual relationship, *Whidbee v. Garzarelli Food*

10

*Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir. 2000) (section 1981 applies to at-will

employment arrangements), and was so entrenched and unchanging that it

amounted to a continuing discriminatory policy or practice. See, e.g., *Kim v. Dial*

*Serv. Int'l*, 1997 U.S. Dist. LEXIS 12544, at *26 (S.D.N.Y. Aug. 7, 1997); *Lee v.*

*Overseas Shipholding Grp., Inc.*, 2001 U.S. Dist. LEXIS 10622, at *26 (S.D.N.Y.

July 30, 2001).

38.    Defendants are therefore liable under 42 U.S.C. § 1981 in an

amount to be determined at trial for, *inter alia*, the discriminatory underpayments

relative to Defendants' non-black housekeepers, damages for the discriminatory

denial of her equal right to the other benefits, privileges, terms, and conditions of

employment referenced above relative to Defendants' non-black housekeepers, and

compensatory damages.

39.    In committing the discriminatory acts alleged herein,

Defendants acted with oppression, and reckless and wanton disregard for and

indifference to Plaintiff's protected civil rights.  Such conduct implicates

compelling public interests, including the public's interest in deterring unlawful

discrimination against, and exploitation of, racial minorities and low wage

workers.  Defendants should be assessed punitive damages in an amount sufficient

to punish Defendants and deter them and other employers from engaging in such

11

illegal and immoral conduct in the future.

## Second Cause of Action

### Race-Based Pay Discrimination and Disparate Treatment in Violation of the NYSHRL

40. The Complaint's other factual allegations are incorporated herein by reference.

41. Nassau Candy is and was at all material times herein a "person" under NYSHRL § 292(1) and an "employer" under NYSHRL § 292(5).

42. Lesley Stier is and was at all material times herein a "person" under NYSHRL § 292(1) and an "employer" under NYSHRL § 292(5).

43. Shirley Stier is and was at all material times herein a "person" under NYSHRL § 292(1), and an "employer" under NYSHRL § 292(5).

44. New York Executive Law § 296 provides, in pertinent part:

"It shall be an unlawful discriminatory practice:

(a)    For an employer …, because of an individual's age, race … [or] color … to refuse to hire or employ … such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

45. For the above-referenced pay discrimination and disparate

treatment, Defendants are liable under the NYSHRL for, *inter alia*, the discriminatory underpayments relative to Defendants' non-black housekeepers, damages for the discriminatory denial of her equal right to the other benefits, privileges, terms, and conditions of employment referenced above relative to Defendants' non-black housekeepers, and compensatory damages, all in amounts to be determined at trial.

46.     If and to the extent Defendants' discriminatory intent was exacerbated by negative feelings about Allen's age (she was much older than Defendants' other housekeepers), then Defendants are likewise liable for such aggravating harm. See *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 572 (2d Cir. 2000) (Sotomayor, J.) ("one type of hostility can exacerbate the effect of another, and [] such aggravating harm is legally cognizable").

47.     Defendants are also liable for punitive damages in amounts to be determined at trial for the reasons set forth above.

### Third Cause of Action

### Violations of the New York Equal Pay Act

48.     The Complaint's other factual allegations are incorporated herein by reference.

13

49.     Since August 8, 2019, the New York Equal Pay Act (New York Labor Law ["NYLL"] § 194) has provided, in pertinent part:

> No employee with status within one or more protected class or classes shall be paid a wage at a rate less than the rate at which an employee without status within the same protected class or classes in the same establishment is paid for: (a) equal work on a job the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions; except where payment is made pursuant to a differential based on [specified factors not applicable here].

50.     Defendants paid Allen wages at a rate equal to approximately $67 per day from August 8, 2019 to early-to-mid March 2020 and approximately $57 per day thereafter until April 2021, which was less than half of the rate Defendants' non-black/African-American and much younger housekeeper named Miriam was paid during that time (believed to be equal to approximately $150 per day, plus travel benefits not provided to Allen) for, apart from Allen's longer workweek, greater experience, and additional duties: (a) equal work on a job (housekeeping) the performance of which requires equal skill, effort and responsibility, and which is performed under similar working conditions, or (b) substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions.

51.     For the reasons discussed above, Defendants' longstanding

policy and practice of paying Allen unequal and illegally-low wages was willful.

52.    Defendants are therefore liable under NYLL §§ 194 and 198(1-a) for Allen's underpaid wages and benefits from August 8, 2019 to April 4, 2021, together with liquidated damages of up to 300% of the amount of such underpayments.

**Fourth Cause of Action**

**Unpaid Minimum Wages in Violation of the FLSA**

53.    The Complaint's other factual allegations are incorporated herein by reference.

54.    In 1974 Congress amended the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., to include within its coverage private domestic workers. *See* 29 U.S.C. §§ 202(a), 206(f), 207(l ), 213(a)(15) and 213(b)(21); *See also Francois v. Mazer*, 2012 WL 653886, at *1 (S.D.N.Y. Feb. 28, 2012) (domestic employees working in private households are covered by the FLSA).

55.    FLSA Section 2 (entitled "*Congressional finding and declaration of policy*") provides, in pertinent part, that "Congress ... finds that the

employment of persons in domestic service in households affects commerce."  29 U.S.C. § 202(a).

56.    In addition, upon information and belief, at all times mentioned herein, employees of Nassau Candy regularly engaged in interstate commerce in connection with their employment, including, but not limited to, distributing manufactured chocolates, cheeses, and other goods from distribution facilities across the Country from distribution facilities located in five different states.

57.    Upon information and belief, at all material times herein Nassau Candy's annual gross sales well exceeded $500,000 per annum and it had at least two employees engaged in commerce.

58.    The FLSA provides that "[e]very employer shall pay to each of his employees . . . who in any workweek is engaged in commerce or in the production of goods for commerce . . . not less than the minimum wage."  29 U.S.C. § 206(b).

59.    Because she was covered by the FLSA, Allen was entitled to be paid not less than the federal minimum wage of $7.25 for each hour she was on duty.

60. When she worked at Defendants' Old Westbury property, Allen generally started by 6:30-7:00 a.m. in about the last three years of employment preparing Mr. Stier's smoothies (except Mondays, when she started at 9:00 a.m.) and generally between 5:00-6:00 a.m. most days before then, when Mr. Stier used to leave for the office very early.

61. Allen generally remained on duty until about 5:30 p.m. if Defendants were going out for dinner, and about 8:00-8:30 p.m. when Defendants were eating in, and later than that when they had parties.

62. When the Stiers spent their summers in the Hamptons, Allen generally worked extra hours because the Stiers often had guests.

63. Likewise, during Covid, the Stiers ate out much less often, causing a corresponding increase in the number of days each week when Allen remained on duty until 8:00-8:30 p.m. or later.

64. Allen's work was demanding and often strenuous, as Defendants had an extraordinarily rigorous cleaning regimen. Allen had to be constantly on the lookout for things like fingerprints on light switches, telephones, etc., and had to often repeatedly clean the same floor to excess and to perform other extraordinarily rigorous cleaning rituals due to Defendants' apparent fear of being contaminated by germs.

17

65.     In addition, Allen could not leave Defendants' premises without permission except on her day off when she had a day off (i.e., before the Covid-19 pandemic), and had to remain in uniform (scrubs) continuously until her workday ended to project the clean, official appearance that the Stiers demanded.

66.     It appears that Defendants rationalized their conduct by imagining that working for them was a pleasant experience that required little exertion by Allen. However, Defendants only indulged in such thinking because they took Allen's considerable, varied, and always-dependable work for granted and stereotyped Allen and treated her as if she were "invisible."

67.     Moreover, Allen was required to be on duty, in uniform, and at Defendants' beck and call from the moment her workday began until the moment it ended.

68.     Defendants were therefore required to compensate her for that entire period. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 36 (2005) (under the FLSA and the Portal-to-Portal amendment thereto, the workday consists of "the period between the commencement and completion on the same workday of an employee's principal activity or activities"); *Singh v. City of N.Y.*, 524 F.3d 361, 367 (2d Cir. 2008) (Sotomayor, J.) ("exertion is not necessarily required for an activity to be compensable because 'an employer, if he chooses, may hire a man to do nothing,

or to do nothing but wait for something to happen.'") (citing *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)); *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 68 (2d Cir. 1997) (to same effect). As explained in DOL Fact Sheet # 79D (online at https://www.dol.gov/agencies/whd/fact-sheets/79d-flsa-domestic-service-hours-worked):

> Generally, when an employee is 'on duty' (that is they must be in the home and prepared to provide services when required), they are working. For example, a nurse who must watch over an ill patient, a chauffeur who must be at the home and ready to drive when directed, or a nanny who must watch over her charge even when sleeping are all on duty and must be paid for all of that time. Under the FLSA, an employee who reads a book, knits, or works a puzzle while awaiting assignments is working during the period of inactivity. In such cases, the employee is "engaged to wait" and must be paid for such time. On the other hand, domestic service employees (including live-in employees) who have been completely relieved from duty and are able to use the time for their own purposes—to go to a movie, run a personal errand, attend a parent-teacher conference— need not be paid for this time.

See also *Jiao v. Chen*, 2007 U.S. Dist. LEXIS 96480, at *41 (S.D.N.Y. Mar. 30, 2007) (inability to leave employer's premises without permission while on duty supports finding that hours are compensable); *De Lano v. United States*, 183 Ct. Cl. 379, 404, 393 F.2d 517, 530 (1968) ("plaintiffs were in uniform because they considered themselves to be on duty.").

69.     In or about November 2016, shortly after another housekeeper's wage and hour lawsuit entitled *Beata Pietrasik v. Lesley Stier and Shirley Stier*, 16-

cv-1513 (E.D.N.Y.) ended, Defendants began requiring Allen and other housekeepers to place their signatures (with Shirley Stier standing over them) on falsified timesheets with the hours allegedly worked filled out in advance.

70.     Some or all of the falsified timesheets listed (in Shirley Stier's handwriting) "6" hours per day for Monday through Friday work, and "10" hours for Saturday work, allegedly totaling only "40" hours per week of compensable time.

71.     With the possible exception of Victoria, Defendants' various other housekeepers worked also overtime without ever being compensated for it.

72.     The falsity of Defendants' pre-filled timesheets is also evident because the housekeepers' workdays varied depending on whether the Stiers ate at home or went out to dinner, in contrast to the static number of hours listed on Defendants' falsified, pre-filled post-litigation timesheets.

73.     Defendants' engineering of falsified, pre-filled post-litigation timesheets proves Defendants' consciousness of guilt and that Defendants' wage and hour violations were willful because it shows that they are the type of people who have no compunction about systematically falsifying timekeeping records to further enrich themselves at the expense of their low-paid servants.

74.     While a more nuanced analysis of Allen's on-duty time over at least the past six years will be established after a process of comprehensive discovery, for present purposes it is conservatively estimated that Allen's on-duty time generally equaled 10.5 hours a day or 62.5 hours a week between Labor Day and Memorial Day prior to early-to-mid March 2021; 11 hours a day or 66 hours a week between Memorial Day and Labor Day prior to early-to-mid March 2021; and 11 hours a day or 77 hours a week from early-to-mid March 2020 until April 2021.

75.     At all material times herein, Defendants paid Allen approximately $57-$67 per day or $400 per week for her compensable work hours, which is less than the federal minimum wage.

76.     Defendants are therefore liable for, *inter alia*, unpaid minimum wages and liquidated damages under the FLSA in an amount to be determined at trial.

**Fifth Cause of Action**

**Unpaid Minimum Wages in Violation of the NYLL**

77.     The Complaint's other factual allegations are incorporated herein by reference.

21

78.    At all material times, Allen worked for Defendants primarily on Long Island.

79.    Defendants were statutorily obligated to pay Allen a minimum wage of not less than $8.75 from December 31, 2014 to December 31, 2015, not less than $9.00 per hour from December 31, 2015 to December 31, 2016, not less than $10.00 per hour from December 31, 2016 to December 31, 2017, not less than $11.00 per hour from December 31, 2017 to December 31, 2018, not less than $12.00 per hour from December 31, 2018 to December 31, 2019, not less than $13.00 per hour from December 31, 2019 to December 31, 2020, and not less than $14.00 per hour from December 31, 2020 until the end of her employment. NYLL § 652(1)(a) and (b).

80.    Moreover, "[a]n employee may not waive the protections of the New York labor laws." *Padilla v. Manlapaz*, 643 F. Supp. 2d 302 (E.D.N.Y. 2009); *Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 110 (2018) (to similar effect).

81.    At all material times herein, Allen was paid less than the minimum wage.

82.    By the latter part of Allen's employment, Defendants were paying Allen less than one-half (50%) of the New York minimum wage.

22

83.     New York law also provides that covered employees such as Allen are entitled to an additional hour's pay at the basic minimum hourly wage rate for any day in which "the spread of hours"—defined as "the interval between the beginning and end of an employee's workday"—exceeds 10 hours.  12 NYCRR § 142-2.1; NYLL § 652(1) and NYLL § 663(1); *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 339 (S.D.N.Y. 2005).

84.     The interval between the beginning and end of Allen's workday generally exceeded 10 hours almost every day during the Covid-19 pandemic, i.e., from early-to-mid March 2020 to April 2021.

85.     Between October 6, 2015 and early-to-mid March 2020, the interval between the beginning and end of Allen's workday generally exceeded 10 hours approximately three days a week between Labor Day and Memorial Day, and approximately four days a week between Memorial Day and Labor Day.

86.     Defendants never paid Plaintiff any spread-of-hours pay.

87.     Accordingly, Defendants are liable to Allen for unpaid minimum wages (including spread-of-hours pay) in amounts to be determined at trial, together with, *inter alia*, liquidated damages.

## Sixth Cause of Action

## Unpaid Overtime in Violation of the NYLL

88.     The Complaint's other factual allegations are incorporated herein by reference.

89.     "[NYLL] § 655 authorizes the wage board to recommend regulations governing overtime, while § 656 directs the Commissioner to either accept or reject any regulations recommended by the wage board, and, pursuant to this delegated authority, there are regulations governing overtime pay." *Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337, 351-53 (E.D.N.Y. 2014) (citing NYCRR §§ 142-2.2, 146-1.4 and *Ahmed v. Subzi Mandi, Inc.*, 2014 U.S. Dist. LEXIS 115228, at *3 (E.D.N.Y. May 27, 2014) ("NYLL's overtime provision specifies that eight hours constitutes a 'legal day's work,' NYLL § 160, and that '[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate . . . .' (citing 12 NYCRR § 142-2.2)), *adopted*, 2014 U.S. Dist. LEXIS 114583 (E.D.N.Y. Aug. 18, 2014).

90.     The overtime regulation promulgated by the New York State Commissioner of Labor (12 NYCRR § 142-2.2) provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the

24

exemptions of sections 7 and 13" of 29 U.S.C. § 201, et seq., the Fair Labor

Standards Act ("FLSA").

91.     "This regulation has been widely recognized as comprising

New York state law." *Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d

337, 351 (E.D.N.Y. 2014).

92.     "Under the regulations implementing the New York Labor

Law, non-exempt employees must be paid at a rate of 'not less than one and one-

half times the regular rate at which he is employed' for any hours worked in excess

of forty hours in a given week." *Thomas v. Meyers Assocs., L.P.*, 39 Misc. 3d

1217(A) (Sup. Ct. N.Y. Co. 2013) (citing 12 NYCRR 142-2.2).

93.     "Labor Law § 663 authorizes a civil action for overtime wages

in accordance with 12 NYCRR 142-2.2." *Ansah v. A.W.I. Sec. & Investigation,*

*Inc.*, 2014 NY Misc. LEXIS 1690 at *26 (Sup. Ct. N.Y. Co. 2014) (citing *Stennett*

*v. Moveway Transfer & Stor., Inc.*, 97 A.D.3d 655, 657 (2d Dept. 2012)).

94.     While a more nuanced analysis of Allen's on-duty time over at

least the past six years will be established after a process of comprehensive

discovery, for present purposes it is conservatively estimated that Allen's on-duty

time generally equaled 10.5 hours a day or 62.5 hours a week between Labor Day

and Memorial Day prior to early-to-mid March 2021, 11 hours a day or 66 hours a

week between Memorial Day and Labor Day prior to early-to-mid March 2021, and 11 hours a day or 77 hours a week from early-to-mid March 2020 until April 2021.

95. No agreement existed between the parties with respect to the payment of overtime for hours worked in excess of 40 (or 44) in a workweek.

96. Defendants failed to comply with, *inter alia*, 12 NYCRR § 142-2.2 and NYLL § 663(1) and § 198 in that Allen, with Defendants' actual and constructive knowledge, generally worked for them in excess of 40 (and 44) hours per week at all material times, but provision was not made by Defendants to pay her at the rate of 1½ times her regular rate for the time worked in excess of 40 (or 44) hours per week.

97. As the Stiers were previously sued for unpaid overtime, and thereafter engineered the signing of falsified pre-filled timesheets, Defendants are and were at all relevant times aware that overtime pay is mandatory for non-exempt employees who work more than 40 (or 44) hours per week.

98. Accordingly, Defendants are liable to Allen for, *inter alia*, unpaid overtime and liquidated damages in an amount to be determined at trial.

**Seventh Cause of Action**

**Violations of the FLSA's
Prompt Payment Requirement**

99.     The Complaint's other factual allegations are incorporated herein by reference.

100.    The FLSA provides that "[e]very employer shall pay to each of his employees . . . who in any workweek is engaged in commerce or in the production of goods for commerce . . . not less than the minimum wage."  29 U.S.C. § 206(b).

101.    Although the FLSA does not specify when such minimum wage payments must be made, it "is clear that the FLSA requires wages to be paid in a timely fashion."  *Rogers v. City of Troy, N.Y.*, 148 F.3d 52 (2d Cir. 1998); see also *Lawtone-Bowles v. City of N.Y.*, 2020 U.S. Dist. LEXIS 95382, at *13 (S.D.N.Y. June 1, 2020) (denying summary judgment where wages were timely paid 96% of the time: "an inquiry into an employer's liability for late payment of overtime focuses not only on how often late payments were made or how late they were, but also on whether the payments were made as soon as practicable.").

102.    Throughout Allen's employment, it was agreed that Allen would be paid once a week for her work.

27

103.   Defendants were therefore obligated to pay Allen's wages no less frequently than once a week. *Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1579 (11th Cir. 1985) ("The employee must actually *receive* the minimum wage each pay period.") (emphasis in original), *mod. on other grounds*, 766 F.2d 265 (11th Cir. 1985); *Perez v. Westchester Foreign Autos, Inc.*, 2013 U.S. Dist. LEXIS 35808, at *30-31 (S.D.N.Y. Feb. 28, 2013) (to same effect).

104.   Consistent with the parties' agreement, Defendants usually paid Allen once a week.

105.   However, Defendants often paid Allen every two to three weeks.

106.   As the Stiers were previously sued by another housekeeper for violating the New York Labor Law's timely pay provision for manual workers (NYLL § 191(1)(a)), on those occasions when Defendants paid Allen late, they were generally careful to provide her with multiple $400 checks, rather than paying her in a lump sum for the accumulated unpaid workweeks.

107.   Discovery will help ascertain the frequency with which Defendants violated the FLSA's prompt payment requirement from October 8, 2018 through April 2021.

108.   Defendants did not have, or claim to have, any valid reason for periodically failing to pay Allen on time.

109.   The untimely manner in which Defendants paid Allen was deliberate, i.e., willful, rather than accidental, involuntary or the result of any difficulty in meeting their payment obligations, and is fully consistent with their calculated disregard of their other wage and hour obligations as set forth above.

110.   For violating the FLSA's prompt payment requirement, Defendants are liable to Allen in an amount to be determined at trial for, *inter alia*, liquidated damages.

## **Eighth Cause of Action**

## **Untimely Paid Wages in Violation of NYLL § 191**

111.   The Complaint's other factual allegations are incorporated herein by reference.

112.   NYLL § 191(1)(a) is a substantive provision of NYLL article 6 which requires that manual workers be paid "weekly and not later than seven calendar days after the end of the week in which the wages are earned[.]"

113.   Allen was a manual worker at all material times herein.

114.   As set forth above, Defendants often failed to pay Allen no later than seven calendar days after the week in which her wages were earned.

115.   The untimely manner in which Defendants paid Allen was deliberate, i.e., willful, rather than accidental, involuntary or the result of any difficulty in meeting their payment obligations, and is fully consistent with their calculated disregard of their other wage and hour obligations as set forth above.

116.   The remedies available through NYLL § 198(1-a) (including liquidated damages) apply to employees bringing claims under § 191. *Vega v. CM & Assoc. Constr. Mgmt.*, LLC, 175 A.D.3d 1144 (1st Dept. 2019); *Caul v. Petco Animal Supplies, Inc.*, 2021 U.S. Dist. LEXIS 184652, at *6-7 (E.D.N.Y. Sep. 27, 2021) ("Since *Vega*, every court in this Circuit to consider that decision appears to have followed its construction of the New York Labor Law.") (collecting cases).

117.   Moreover, "[a]n employee may not waive the protections of the New York labor laws." *Padilla v. Manlapaz*, 643 F. Supp. 2d 302 (E.D.N.Y. 2009).

118.   Accordingly, once the Court determines the amount of untimely wages paid to Allen, it should award her, *inter alia*, liquidated damages in amounts to be determined at trial.

**Ninth Cause of Action**

**Unpaid Wages in Violation of NYLL Article 6**

119.   The Complaint's other factual allegations are incorporated herein by reference.

120.   Defendants, through Shirley Stier, promised Allen that she would receive $20,000 in severance pay if she remained with the Stiers until she retired.

121.   This promise of $20,000 in severance was originally made when the Stiers lived in Merrick, and was repeated to Allen after they moved to Old Westbury.

122.   Allen accepted that offer, and kept her end of the bargain, but when she retired after serving four generations of the Stier family over the course of 37 years, she only received an envelope containing $6,000—i.e., $14,000 less than what was promised.

123.   The $14,000 has since been demanded, but has not been paid.

124.   Defendants are liable for unpaid severance and liquidated damages under Labor Law Article 6 for breaching their agreement to pay Gloria $20,000 as severance pay upon retirement. *Gertler v. Davidoff Hutcher & Citron*

*LLP*, 186 A.D.3d 801, 803 (2d Dept. 2020) ("[C]ontrary to the defendant's contention, …the severance wages fall within the definition of wages as set forth in Labor Law § 190(1). Therefore, such wages are protected by the provisions set forth in Labor Law § 193 and fall within the ambit of remedies provided by Labor Law § 198"); *Lord v. Marilyn Model Mgmt., Inc.*, 173 A.D.3d 606, 607 (1st Dept. 2019) ("The complaint also sufficiently alleges causes of action for … recovery of severance as unpaid wages under Labor Law article 6."); NYLL § 198(3) ("All employees shall have the right to recover full wages, benefits and wage supplements and liquidated damages accrued during the six years previous to the commencing of such action, whether such action is instituted by the employee or by the commissioner. There is no exception to liability under this section for the unauthorized failure to pay wages, benefits or wage supplements."); NYLL § 193 (to same effect).

125.   Defendants are thus liable under NYLL §§ 193, 195, 198(3) and 198(1-a) for, *inter alia*, unpaid severance of $14,000, plus an equal amount as liquidated damages.

126.   In the alternative, if NYLL Article 6 is found not to apply to Allen's claim for unpaid severance notwithstanding NYLL § 190's sweeping definition of wages and the express provisions of NYLL §§ 193 and 198(3), then

32

Defendants are liable for said unpaid severance under common law breach of contract principles.

## Conclusion

WHEREFORE, Allen respectfully requests a judgment as follows, in amounts to be determined at trial:

(A)    on her First, Second and Third Causes of Action for Race-Based Pay Discrimination and Disparate Treatment in Violation of 42 U.S.C. § 1981, the New York State Human Rights Law, and New York Equal Pay Act, unpaid and lost wages and benefits, liquidated damages, compensatory damages, nominal damages, and punitive damages, all in amounts to be determined at trial;

(B)    on her Fourth, Fifth, and Sixth Causes of Action under the FLSA and NYLL for minimum wage and overtime violations, unpaid statutory wages and liquidated damages in amounts to be determined at trial;

(C)    on her Seventh and Eighth Causes of Action for untimely paid wages in violation of the FLSA's prompt payment requirement and NYLL § 191, liquidated damages in amounts to be determined at trial;

(D)     on her Ninth Cause of Action for unpaid wages in violation of NYLL

Article 6, $14,000 in unpaid severance pay and an equal amount as

liquidated damages; and

(E)     on all causes of action, attorney's fees, prejudgment interest, costs,

disbursements, and such other and further relief as is just.

JURY TRIAL: Plaintiff demands a trial by jury of all issues so triable.

Dated: November 18, 2021

> Law Offices of Scott A. Lucas
> 200 Park Avenue
> Suite 1700
> New York, New York 10166
> (direct) (646) 342-1139
> (office) (646) 632-3737
> scott@lucasemploymentlaw.com
> *Attorneys for Plaintiff Gloria Allen*
>       */S/ Scott A. Lucas*
> By:  Scott A. Lucas